

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,879

**JUAN LIZCANO, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL IN CAUSE NO. F05-59563-QS
IN THE 282ND JUDICIAL DISTRICT COURT
OF DALLAS COUNTY**

PRICE, J., filed a concurring and dissenting opinion in which JOHNSON and HOLCOMB, JJ., joined.

### CONCURRING AND DISSENTING OPINION

I agree that there is no reversible error affecting the guilt phase of the appellant's trial, and I concur in the result of those portions of the Court's opinion. But I dissent to the Court's disposition of the appellant's forty-ninth point of error, challenging the jury's finding that he is not mentally retarded. At issue in this case is not simply whether the jury could rationally find that the appellant is not mentally retarded for purposes of the Eighth

Amendment ban on executing mentally retarded offenders. At issue is the more fundamental question whether it is the jury that gets to say *what the Eighth Amendment standard for determining mental retardation is in the first place*. Because I do not believe that question is properly delegated to the jury to decide, I am compelled to dissent.

## I.

In his forty-ninth point of error, the appellant argues that the jury's verdict finding that he did not establish his mental retardation by a preponderance of the evidence is against the great weight and preponderance of the evidence. This is, in essence, a claim of factual insufficiency, since it is an issue upon which, we have said, the appellant shoulders the burden of proof.[1] As such, it is subject to our rule that evidentiary sufficiency should be measured against a hypothetically correct jury charge.[2] In capital-murder cases, this Court has jurisdiction to review factual-sufficiency claims.[3] The Court therefore rightly takes up the appellant's forty-ninth claim. In doing so, the Court measures the evidence of mental

---

[1]
*See Meraz v. State*, 785 S.W.2d 146, 154-55 (Tex. Crim. App. 1990) (with respect to issues upon which the defendant is assigned the burden of proof, direct-appeal courts in Texas may review factual sufficiency of the evidence, asking whether jury's verdict was against the great weight and preponderance of the evidence); *Gallo v. State*, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007) (burden of proof in capital murder punishment proceeding is on the defendant to establish mental retardation by a preponderance of the evidence).

[2]
*See Wooley v. State*, 273 S.W.3d 260, 268 (Tex. Crim. App. 2008) (factual sufficiency review entails use of hypothetically correct jury charge); *Grotti v. State*, 273 S.W.3d 273, 281 (Tex. Crim. App. 2008) (same).

[3]
*Grotti, supra*, at 279; *Watson v. State*, 204 S.W.3d 404, 413 (Tex. Crim. App. 2006); *Bigby v. State*, 892 S.W.2d 864, 874-75 (Tex. Crim. App. 1994).

retardation against the definition that was submitted in the court's charge at the conclusion of the punishment phase of trial. But the Court undertakes no analysis of whether that jury charge definition was hypothetically correct. It makes a difference.

The jury's verdict with respect to mental retardation was a general one, in the sense that it did not explicitly indicate in what respect the jury found the appellant's evidence of mental retardation lacking. The Court today concludes that to the extent that this general verdict might have reflected the jury's rejection of the appellant's evidence of significantly sub-average intellectual functioning as measured by standardized IQ testing,[4] it was against the great weight and preponderance of the evidence.[5] I agree with this assessment. It is with respect to the second prong of the definition of mental retardation—the related-deficits-in-adaptive-functioning prong—that the Court today finds the appellant's evidence to be not so compelling that it must conclude that the jury's verdict was against the great weight and preponderance of the evidence.

In coming to this conclusion, the Court measures the evidence of the appellant's level

---

[4]    In *Ex parte Briseno*, we defined "mental retardation" for purposes of the Eighth Amendment's categorical prohibition against executing mentally retarded offenders embodied in *Atkins v. Virginia*, 536 U.S. 304 (2002), in the absence of any legislative proclamation on the subject, to constitute "a disability characterized by: (1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." 135 S.W.3d 1, at 7 (Tex. Crim. App. 2004) (footnotes and internal quotation marks omitted). The trial court's charge to the jury at the conclusion of the punishment phase in this case defined mental retardation in precisely these terms.

[5]    Majority opinion, at 23-25.

of adaptive functioning against the definition of "adaptive behavior" (not, it should be noted, "adaptive functioning") that the trial court supplied to the jury in the charge. That definition comes from Section 591.003(1) of the Texas Health and Safety Code: "'Adaptive behavior' means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group."[6] Presumably, the trial court chose this definition because this Court implicitly endorsed it in a footnote in *Ex parte Briseno*.[7] The appellant did not object to this definition, and I agree that it is hypothetically correct—insofar as it goes.

But this was not the only definition of adaptive functioning that we mentioned in our footnote in *Briseno*. We also noted the definition of "limitations in adaptive functioning" that was endorsed by the American Association on Mental Retardation (AAMR, now the American Association on Intellectual and Developmental Disabilities, or AAIDD), *viz*: "Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, *as*

---

[6] TEX. HEALTH & SAFETY CODE, § 591.003(1).

[7] 135 S.W.3d at 7 n.25.

*determined by clinical assessment and, usually, standardized scales.*"[8]  In *Atkins*,[9] both definitions of adaptive deficits noted by the Supreme Court included specific clinical criteria for measuring adaptive deficits.[10]  The AAMR defined adaptive deficits to be "limitations *in two or more of the following applicable adaptive skill areas*: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work."[11]  Similarly, the American Psychiatric Association (APA) defined (then and now) adaptive limitations to be "significant limitations in adaptive functioning *in at least two of the following skill areas*: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety."[12]

---

[8]   *Id.* (emphasis added).

[9]   *Atkins v. Virginia*, 536 U.S. 304 (2002).

[10]   *Id.* at 308 n.3.

[11]   *Id.* (emphasis added), *citing* the AAMR publication, Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed. 1992).  In 2002, in its tenth edition of this publication, the AAMR modified the criteria somewhat, consolidating some of the skill areas and requiring significant limitations in only one of the three to justify a diagnosis of mental retardation. *See* AAMR, Mental Retardation: Definition, Classification, and Systems of Support 20-23 (10th ed. 2002).  These various definitions, "while following developments in consensus in the clinical field, have retained a consistent core meaning."  John H. Blume, Sheri Lynn Johnson and Christopher Seeds, *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 CORNELL J. L. & PUB. POL'Y 689, 696 n.28 (Summer 2009).

[12]   *Id.* (emphasis added), *citing* Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 41 (4th ed. 2000).  It was this latter APA definition and clinical diagnostic criteria that the parties in this case seem to have agreed upon.

Today the Court fails to take these diagnostic criteria into account in gauging whether the jury's rejection of mental retardation is against the great weight and preponderance of the evidence. It is not entirely clear to me why. In *Briseno*, we noted that the

> definitional question is not before us in this case because applicant, the State, and the trial court all used the AAMR definition. Until the Texas Legislature provides an alternate statutory definition of "mental retardation" for use in capital sentencing, we will follow the AAMR or Section 51.003(13) criteria in addressing *Atkins* mental retardation claims.[13]

We ultimately adopted the findings of fact of the convicting court in *Briseno*, which expressly found that the applicant had failed to satisfy the "diagnostic criteria" for the adaptive deficits "prong" of the standard for mental retardation.[14]

The Texas Legislature has still not acted to define mental retardation in the capital context, either for purposes of post-conviction habeas corpus review (as in *Briseno*), or, more critically today, for purposes of a jury's assessment of mental retardation at the punishment phase of a capital-murder trial. So, consistent with the "temporary judicial guidelines" that we announced in *Briseno* to fill in "during this legislative interregnum,"[15] should we not hold that the hypothetically correct jury charge embraces the diagnostic criteria for mental

---

[13]

135 S.W.3d at 8, *citing* TEX. HEALTH & SAFETY CODE § 591.003(13), which reads: "'Mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." The Health and Safety Code nowhere incorporates the specific diagnostic criteria of the AAMR or the APA.

[14]

*Id*. at 18.

[15]

*Id*. at 5.

retardation?  Why today does the Court fail to measure the appellant's sufficiency claim specifically against those diagnostic criteria?  The Court does not say.

Presumably, the Court does not believe that the jury is bound by the diagnostic criteria.  There is certainly fodder for such a belief in our *Briseno* opinion.  In asking ourselves how we should go about defining mental retardation in the wake of *Atkins*, we noted that the Supreme Court had "left 'to the States the task of developing appropriate ways to enforce the constitutional restriction [against executing the mentally retarded] upon [their] execution of sentences.'"[16]  We apparently took this to mean that we were free to tinker not only with the procedural mechanisms for enforcing the Eighth Amendment prohibition, but also with the substantive definition of mental retardation.[17]  Observing that the clinical

---

[16]

*Id.*, *quoting Atkins*, *supra*, at 317, which in turn quoted *Ford v. Wainwright*, 477 U.S. 399, 405 (1986).

[17]

Legal commentators exhibit stark disagreement as to whether *Atkins* contemplated that the various states would have significant latitude to define mental retardation for themselves.  *Compare, e.g.*, Peggy M. Tobolowsky, *Atkins Aftermath: Identifying Mentally Retarded Offenders and Excluding Them From Execution*, 30 J. LEGIS. 77, 85 (2003) ("Rather than dictating the definitional . . . attributes of the death penalty exclusion, the Court entrusted this responsibility to the states utilizing capital punishment[.]  * * *  The manner in which capital punishment states define mental retardation for purposes of the exclusion from the death penalty will obviously have the greatest impact on the actual scope of the Court's holding."  However, the various states "should ensure that the definitional provisions in their capital punishment exclusion provisions are at least as comprehensive as the clinical definitions referenced by the Court in *Penry* and *Atkins.*");  Judith M. Barger, *Avoiding Atkins v. Virginia: How States Are Circumventing Both the Letter and the Spirit of the Court's Mandate*, 13 BERKELEY J. CRIM. L. 215, 226 (Fall 2008) ("the Atkins Court left it to the states to define the term 'mental retardation'");  *and* Penny J. White, *Treated Differently in Life but Not in Death: The Execution of the Intellectually Disabled After Atkins v. Virginia*, 76 TENN. L. REV. 685 (Spring 2009) (Supreme Court in *Atkins* "declined to establish . . . a uniform definition of mental retardation . . ., instead deferring the matter to the individual states.  The Court's deferral has resulted in an incongruity with a perverse result: The Eighth Amendment takes on different meanings

definition of mental retardation is deliberately broad so as to ensure inclusiveness in order

to "provide an adequate safety net" in the form of social services "for those who are at the

---

in different states."), *with* Richard J. Bonnie & Katherine Gustafson, *The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases*, 41 U. RICH. L. REV. 811, 818 & n.26 (May 2007) ("Although the Supreme Court left it to the states to enforce the new constitutional rule, Atkins did not leave each state free to define mental retardation. * * * Any definition of mental retardation used to implement Atkins must not cover a smaller group of individuals than the definition adopted by the American Association of [sic] Mental Retardation.").

In leaving to the states "the task of developing appropriate ways to enforce" the Eighth Amendment ban on execution of mentally retarded offenders, 536 U.S. at 317, the Court in *Atkins* expressly borrowed from the approach it had taken to implementation of the constitutional ban on executing the insane in *Ford v. Wainwright*, 477 U.S. 399 (1986). But any contention that this approach confers unfettered discretion on the states to substantively define mental retardation in any way they see fit is belied by the Supreme Court's subsequent decision in *Panetti v. Quarterman*, 551 U.S. 930 (2007). *Panetti* makes it clear that the states are not completely free to define insanity for Eighth Amendment purposes, notwithstanding the wide latitude that *Ford* afforded them to fashion various procedures that would satisfy due process. *Id*. at 954-60 ("It is . . . error to derive from *Ford*, and the substantive standard for incompetency [to be executed] its opinions broadly identify, a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted."). I seriously doubt that, in conferring upon the states the discretion to prescribe procedural mechanisms to implement the Eighth Amendment ban on executing the mentally retarded, the Supreme Court intended to permit the states to define mental retardation less comprehensively than the clinical definitions it cited approvingly in *Atkins*. After all, it was largely on the basis of recent statutory enactments that at least "generally conform" to those clinical definitions that the Supreme Court was able to discern the emerging national consensus necessary to recognize the constitutional ban in the first place under Eighth Amendment jurisprudence. 536 U.S. at 317 n.22.

It is true that, in a post-*Atkins* opinion, the Supreme Court itself explained that *Atkins* "did not provide definitive procedural *or substantive* guides for determining" mental retardation for Eighth Amendment purposes. *Bobby v. Bies*, ___ U.S. ___, 129 S.Ct. 2145, 2150 (2009) (emphasis added). But in that same opinion the Supreme Court noted that a prior proceeding had not resolved the issue of mental retardation for purposes of *Atkins* because no Ohio court had yet "found, for example, that Bies suffered 'significant limitations in two or more adaptive skills.'" *Id*. at 2152, *quoting State v. Lott*, 97 Ohio St.3d 303, 305, 779 N.E.2d 1011, 1014 (2002). In *Lott*, the Ohio Supreme Court adopted a definition of mental retardation that fully embraced the diagnostic criteria recognized in footnote 3 of *Atkins*, thus "generally conforming" to the clinical definitions that informed the Supreme Court's ascertainment of the national consensus.

margin," we questioned whether such a definition was necessarily appropriate to the "normative" judgment of which capital offenders are sufficiently less culpable than the run of capital offenders as to justify a categorical exemption from execution.[18]  In this context, we further asked ourselves whether there is "a consensus of Texas citizens [who] agree that all persons who might legitimately qualify for assistance under the social services definition of mental retardation be exempt from an otherwise constitutional penalty?"[19]  Ultimately, we "decline[d] to answer that normative question without significantly greater assistance from the citizenry acting through its Legislature."[20]

As noted above, we filled the legislative void by (at least provisionally) adopting the AAMR and Texas Health and Safety Code definitions—without, however, expressly embracing the specific diagnostic criteria included in the AAMR definition.  Instead, we promulgated certain non-diagnostic criteria of our own—the so-called *"Briseno"*

---

[18]  *Id*. at 6.

[19]  *Id*.  Query whether, for purposes of construing the Eighth Amendment, the relevant consensus would be that of the citizens of Texas.  In *Atkins*, the Supreme Court looked for a national consensus, which is in keeping with a construction of the Eighth Amendment to the United States Constitution—and even then, the Court's "own judgment [was] brought to bear by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators."  536 U.S. at 313 (internal citations and quotations omitted).  Were we construing the "cruel or unusual punishment" clause of Article I, Section 13, of the Texas Constitution, then we might be looking for a consensus among the citizens of Texas.  *See, e.g.*, *Van Tran v. State*, 66 S.W.3d 790, 804-05 (Tenn. 2001) (looking to the "societal view in our own state" in determining that execution of the mentally retarded violated article I, § 16, of the Tennessee Constitution).

[20]  *Id*.

factors[21]—and proclaimed:

> Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.[22]

In failing thus to anchor the fact-finder's decision on the specific diagnostic criteria, we seem

to have granted a certain amorphous latitude to judges and juries in Texas to supply the

---

[21] Those factors are:

• Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

• Has the person formulated plans and carried them through or is his conduct impulsive?

• Does his conduct show leadership or does it show that he is led around by others?

• Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

• Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

• Can the person hide facts or lie effectively in his own or others' interests?

• Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

135 S.W.3d at 8-9.

[22] *Id*. at 9.

normative judgment—to say, in essence, what mental retardation *means* in Texas (and, indeed, in the individual case) for Eighth Amendment purposes.

Or, stated another way (in terms of the actual jury instruction that was submitted in this case), *Briseno* would seem to authorize the fact finder to decide just what "the standard" *is* in Texas for "personal independence and social responsibility expected of the person's age and cultural group"—without necessarily taking into account the specific criteria that diagnosticians in the field routinely use to make that determination. Is the Texas fact-finder at liberty to define mental retardation differently than a consensus of Americans would define it for Eighth Amendment purposes? May a particular Texas jury, for example, given the definition of mental retardation that was submitted in the jury charge in this case, simply decide that an offender whom the jury believes fits the diagnostic criteria for mild mental retardation nevertheless meets "the standard" the jury deems appropriate for "personal independence and social responsibility" relative to his age and cultural milieu?

Many commentators have construed *Briseno* to allow just such an untethered fact finding, and we have been roundly criticized in some quarters for it.[23] Perhaps justifiably so.

---

[23]

*See, e.g.*, Blume, Johnson & Seeds, *supra*, at 714 ("the Briseno factors focus on a few facts, which portray stereotype, strength-first or strength-only reasoning, at best a handful of itemized weaknesses, and are satisfied by answers to those questions alone," thus inviting the fact-finder to determine mental retardation, *vel non*, on a basis both less than and different from a full assessment of all the diagnostic criteria); White, *supra*, at 705 (criticizing *Briseno* factors as exemplifying a "circularity" of reasoning that operates to "evade" *Atkins*); Carol S. Steiker & Jordan M. Steiker, *Atkins v. Virginia: Lessons From Substance and Procedure in the Constitutional Regulation of Capital Punishment*, 57 DEPAUL L. REV. 721, 727-28 (Spring 2008) (The *Briseno* factors deviate from the methodology of "professionals in the field, [who] use standardized criteria to detect significantly subaverage adaptive functioning. Although Texas embraces the standard test for mental

I agree, of course, that whether a capital offender is mentally retarded is a fact issue, and that it should be left to the fact-finder to resolve in an adversarial context. It should not be an issue for experts to debate and determine in some inquisitorial process that is alien to our system of criminal justice. But this does not justify our apparent grant of latitude to fact-finders in Texas to adjust the clinical criteria for adaptive deficits to conform to their own normative judgments with respect to which mentally retarded offenders are deserving of the death penalty and which are not. *Atkins* adopted a categorical prohibition. It was founded upon the Supreme Court's ratification of the prevalent legislative judgment that it is inappropriate to execute mentally retarded offenders. That legislative judgment comprehended mental retardation in essentially the same "clinical" terms as the AAMR's and APA's diagnostic criteria.[24] Even if the Supreme Court in *Atkins* "did not mandate the application of a particular mental health standard for mental retardation, . . . it did recognize

---

retardation in its health and safety statute, the court-crafted overlay for assessing deficits in adaptive behavior in capital cases is not grounded in professional practice or guidelines."); Anna M. Hagstrom, *Atkins v. Virginia: An Empty Holding Devoid of Justice For the Mentally Retarded*, 27 LAW & INEQ. J. 241, 254 (Winter 2009) ("The Briseno opinion made it clear that in Texas, the ultimate determination of a defendant's mental retardation should be made by the factfinder, not by experts in the field. Amazingly, the court held that psychological diagnostic criteria do not necessarily determine whether the defendant is mentally retarded for purposes of the Eighth Amendment's ban on excessive punishment. * * * Instead, it instructs finders of fact to examine additional factors—which were invented by the court without any basis in scientific literature or evidence regarding mental retardation—in order to determine if the evidence indicates that the defendant is mentally retarded.").

[24] *See Atkins*, *supra*, at 317 n.22 ("The statutory definitions of mental retardation [contained in the statutes of those states that had expressly outlawed the death penalty for mentally retarded capital offenders] are not identical, but generally conform to the clinical definitions" supplied by the AAMR and APA).

the significance of professional standards and framed the constitutional prohibition in medical rather than legal terms."[25] It would be anomalous to allow the fiat of a fact-finder to undermine the essentially diagnostic character of the inquiry.[26] We should not sanction incomplete jury instructions that would permit a jury, in the guise of "fact-finder," capriciously to deviate from the specific diagnostic criteria in order to conform to its own

---

[25] White, *supra*, at 706.

[26] Assuming that *Atkins* did leave to the states the option of defining mental retardation for themselves, *see* n.17, *ante*, the post-*Atkins* response of a majority of the states that impose the death penalty has been to include either the APA or the AAMR/AAIDD diagnostic criteria within that definition—either expressly by statute, *see* 11 Del. C. § 4209(d)(1); *Pizzuto v. State*, 146 Idaho 720, 728, 202 P.3d 642, 650 (2008); *Bowling v. Commonwealth*, 163 S.W.3d 361, 370 n.8 (Ky. 2005); *State ex rel. Lyons v. Lombardi*, ___ S.W.3d ___ , 2010 WL 290391 (Mo., delivered Jan. 26, 2010) (slip op. at *2); *State v. Locklear*, 363 N.C. 438, 462, 681 S.E.2d 293, 311 (2009); by judicial construction of the relevant statute, *see In re Hawthorne*, 35 Cal.4th 40, 47-48, 105 P.3d 552, 556-57, 24 Cal.Rptr.3d 189, 195 (2005); *Phillips v. State*, 984 So.2d 503, 511 (Fla. 2008); *State v. McManus*, 868 N.E.2d 778, 787-88 (Ind. 2007); *State v. Williams*, 22 So.3d 867, 880-81 (La. 2009); *State v. Vela*, 279 Neb. 94, 151 777 N.W.2d 266, 308 (2010); *State v. White*, 118 Ohio St.3d 12, 14, 885 N.E.2d 905, 908 (2008); *Howell v. State*, 151 S.W.3d 450, 457 (Tenn. 2004); or, in those states lacking a statute (as does Texas), by judicial directive, *see Chase v. State*, 873 So.2d 1013, 1027-28 (Miss. 2004); *Lambert v. State*, 126 P.3d 646, 650 (Okla. Crim. App. 2005). Oklahoma has expressly included the diagnostic criteria into its jury instructions. *See Murphy v. State*, 54 P.3d 556, 568 & 570 (Okla. Crim. App. 2002) (adopting Appendix "A," requiring jury to determine: "Does the defendant have significant limitations in adaptive functions in at least two of the following skills areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work."). As far as I can tell, a minority of states, including Alabama (*In re Smith v. State*, ___ So.2d ___ , 2007 WL 1519869 (Ala., delivered May 25, 2007)), Arizona (*State v. Grell*, 212 Ariz. 516, 135 P.3d 696 (2006)), Arkansas (*Miller v. State*, ___ S.W.3d ___ , 2010 WL 129708 (Ark., delivered Jan. 7, 2010)), New Mexico (which has since repealed its death penalty) (*State v. Trujillo*, 146 N.M. 14, 206 P.3d 125 (2009)), Pennsylvania (*Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170 (2009)), South Carolina (*Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003)), Virginia (*Atkins v. Commonwealth*, 272 Va. 144, 631 S.E.2d 93 (2006)), and Utah (Utah Code Ann. § 77-15a-102(1) (Supp. 2003)), while embracing the concept of adaptive deficits, have not (or, in some cases, at least not *yet*) incorporated the specific diagnostic criteria into their post-*Atkins* definitions of mental retardation.

normative, necessarily subjective, and certainly unscientific judgment regarding who deserves the death penalty.[27] I would hold that the hypothetically correct jury charge, against which we measure the weight and preponderance of the evidence with respect to mental retardation, should incorporate the diagnostic criteria. In this case, the difference really matters.

## II.

I agree with the Court that the appellant was not entitled to a judgment notwithstanding the verdict with respect to the mental-retardation issue just because the appellant presented experts while the State did not.[28] Lay testimony with respect to adaptive behavior is not categorically incompetent to refute expert testimony. Moreover, the Court does a good job of summarizing the lay testimony—both pro and con—relevant to adaptive deficits.[29] But, curiously, in assessing the weight of the evidence as it relates to adaptive deficits, the Court does not even mention the appellant's expert testimony.

The appellant called two experts to the witness stand who testified about his adaptive

---

[27]

The jury in a capital-punishment proceeding in Texas exercises *that* normative judgment in answering the third special issue with respect to mitigating circumstances. TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1). But *Atkins* established that mental retardation is categorically mitigating—as a matter of law. While the fact-finder in an adversarial system should, of course, decide whether a capital offender is mentally retarded, it should not be allowed to determine for itself what constitutes mental retardation for Eighth Amendment purposes.

[28]

Majority opinion, at 21-22.

[29]

*Id*. at 25-28.

deficits. The first was Dr. Antonio Puente, a clinical neuropsychologist and university professor, and an expert on evaluating mental retardation in native Spanish speakers. Puente explained that he did not administer any of the standardized instruments for assessing adaptive deficits, such as "the *Vineland* or the *ABAS* test," because "[t]here is no scale available in Spanish that's normed to these people, that is, Spanish-speakers."[30] Utilizing the APA's diagnostic criteria, Dr. Puente was able to identify significant adaptive deficits in at least six of the eleven APA categories: communication, self-care, home living, self-direction, functional academic skills, and work. The information in support of Puente's opinion derived from reports provided by the appellant's mitigation investigator and Puente's own clinical interview with the appellant. Puente admitted on cross-examination that he did not factor in the circumstances of the instant offense as described to him by the prosecutor, but opined that, had he done so, he would have regarded them as further evidence of the appellant's adaptive deficits.

The appellant's second expert witness was Dr. Kristi Compton, a clinical and forensic psychologist. By and large, her testimony focused more on the appellant's IQ scores than on

---

[30] According to the DSM-IV-TR:

> Several scales have . . . been designed to measure adaptive functioning or behavior (e.g., the Vineland Adaptive Behavior Scales and the American Association on Mental Retardation Adaptive Behavior Scale). * * * As in the assessment of intellectual functioning, consideration should be given to the suitability of the instrument to the person's socio-cultural background, education, associated handicaps, motivation, and cooperation.

DSM-IV-TR, at 42.

his adaptive deficits. But she did testify that the evidence she had reviewed—the same information that Dr. Puente had reviewed, plus her own clinical interview—indicated that "there were adaptive deficits in [the appellant's] childhood" that "seem to dovetail" with his low IQ scores. Her written report was admitted into evidence for its substantive content, and so was before the jury. Like Dr. Puente, Dr. Compton utilized the diagnostic criteria for adaptive deficits set out by the APA in the DSM-IV-TR. She provided a chart in her report of the appellant's adaptive strengths and deficits, as gleaned from the mitigation investigator's report.[31] Over the course of the appellant's life, including his childhood and adolescence, he exhibited adaptive deficits, in her estimation, in at least six of the eleven

---

[31]

From her clinical interview with the appellant, Dr. Compton also learned that the appellant:

> reports that he has never lived alone, he has always lived with a family member. * * * He has never managed a checking account or had a credit card. * * * [He] has not paid bills independently or on his own. * * * [He] reported that he did not fill out the forms at Western Union, rather the clerk would complete the form for him. * * * He reports navigating by familiar buildings and sites, not by road signs. * * * He reports being unable to read a map. * * * [He] was asked to tell the time on a watch. He was unable to do so, stating that he needs a "number clock." [He] reported that he always got to work on time, but that his brother, not he, set the alarm clock. * * * [He] obtained a cell phone which was purchased by his girlfriend. He reports being able to dial the phone, but did not understand how "to put names in."

However, Dr. Compton testified that she does not "personally rely on self-reports on adaptive deficits because there's no guarantee that they're reporting accurately to me." The reason for this unreliability, she explained, is that typically a mildly mentally retarded individual will attempt "to fake not being retarded[.]" *See Ex parte Van Alstyne*, 239 S.W.3d 815, 822-23 & n.23 (Tex. Crim. App. 2007) ("mildly mentally retarded individuals often learn to disguise their disabilities in a so-called 'cloak of competence.'"). Of course, the opposite could conceivably be true here—at the time that he spoke with Dr. Compton, the appellant had a motive to exaggerate his disabilities in an attempt to avoid the death penalty. Still, his self-reporting is corroborated by the lay testimony regarding his adaptive deficits as cataloged by the Court's opinion. Majority opinion, at 25-28.

APA categories. For four of those six categories, she was unable to identify evidence of any

countervailing adaptive strength: communications, self-care, functional academic skills, and

use of community resources. In concluding that the appellant "shows adaptive deficits in

more than two areas" (which is more areas than is required for a diagnosis of mental

retardation under the APA diagnostic criteria), Dr. Compton observed that, "[w]hile [the

appellant] possesses some adaptive strengths, this does not negate the evidence of his

possessing adaptive deficits since childhood." Moreover, and critically, she observed that

"strengths often co-exist with deficits as [in] all people whether they are mentally retarded

or are of normal intelligence."

The reason this last observation is critical is because of its bearing on the question of

the weight of the evidence in this case. As one legal commentator has emphasized:

> [O]ne of the key assumptions to be utilized in the application of the AAMR's
> mental retardation definition [is] that limitations often coexist with strengths
> within an individual. Therefore, the presence of a strength in a particular area
> does not negate the coexistence of a limitation in another area of sufficient
> significance to establish the adaptive behavior component of the mental
> retardation definition.[32]

For this reason, as the Oklahoma Court of Criminal Appeals has recognized, "[u]nless a

---

[32] Tobolowsky, *supra*, at 97, *citing* AAMR, 10th ed., *supra* note 53, at 48 (listing among five assumptions deemed essential to the application of its clinical definition of mental retardation, "Within an individual, limitations coexist with strengths."). Presumably this essential assumption applies equally to the APA's clinical definition of mental retardation, with its functionally similar diagnostic criteria. *See Holladay v. Allen*, 555 F.3d 1346, 1363 (11th Cir. 2009) ("Individuals with mental retardation have strengths and weaknesses, like all individuals. Indeed, the criteria for diagnosis recognizes this by requiring a showing of deficits in only two of ten identified areas [in the DSM-IV-TR] of adaptive functioning.").

defendant's evidence of particular limitations is specifically contradicted by evidence that he does not have those limitations, then the defendant's burden is met no matter what evidence the State might offer that he has no deficits in other skill areas."[33] Accordingly, in gauging the appellant's case for mental retardation, we should examine the strength of his evidence to show adaptive deficits in at least two of the diagnostic categories, as well as the strength of the State's evidence (if any) to refute the appellant's evidence of adaptive deficits in (at least all but one of) the particular diagnostic categories upon which he relies.

The State presented no expert testimony of its own, with respect to adaptive deficits or any other of the three prongs of the definition of mental retardation.[34] The appellant's own evidence of adaptive deficits in *at least two* of the diagnostic areas is compelling; Drs. Puente and Compton agreed that the appellant was deficient in the areas of communication, self-

---

[33]

*Lambert v. State*, *supra*, at 651. The court went on to observe: "In fact, the State need not present any evidence that a capital defendant can function in areas other than those in which a deficit is claimed. In capital mental retardation proceedings, the State's first response must always be to counter the evidence presented by the defendant." *Id*. In other words, the State's evidence should be designed specifically to rebut the defendant's evidence of deficits in specific categories of the AAMR/APA diagnostic criteria. Evidence of adaptive strength in any of the *other* areas will not impugn the defendant's case for mental retardation.

[34]

Dr. Puente did admit that "Dr. [Randall] Price, the State's expert, disagrees with [Puente's] opinion about the mental retardation" of the appellant. Dr. Puente was not asked, however, and did not volunteer, whether Dr. Price's rejection of his conclusion was based upon the adaptive deficits component of the clinical standard for mental retardation. Dr. Puente did testify, however, that Dr. Price had not had the benefit of all of the underlying data that had been collected to support Puente's assessment of the appellant's adaptive deficits. He also testified that it was not "scientifically sound to base a diagnosis of mental retardation only on a clinical interview[,]" thereby implying that Dr. Price's disagreement with Puente's conclusion may have been based purely on a clinical interview alone. Dr. Price himself did not testify.

care, and functional academic skills.[35] Lacking expert testimony to counter these opinions, the State resorted to cross-examination and lay testimony in an effort to undermine them. In my view, the State's effort fell woefully short.

**Communication:** With respect to the appellant's communication skills, Dr. Puente testified:

> On the two tests that measure ability to communicate, he's functioning between eight and ten years of age.[[36]] And the historical information, there's some data to suggest that he's very poor at delivering jokes, unable to understand work instructions. In the past, I've heard from him that he has had difficulty understanding what his supervisors have told him.

The lay testimony, as summarized by the Court, certainly corroborates this account. It showed that the appellant was a slow learner, both at school and in the workplace, that he was reticent to speak, that his vocabulary, even in his native Spanish, was "basic" and his communications, "simple," that his demeanor was "childish," and that he had substantial difficultly comprehending jokes and following or retaining instructional information. The best that the State could muster in response was the testimony of one co-worker that, in his experience, the appellant was no slower to learn than other workers from Mexico, and that he sometimes *did* laugh at the appropriate times. This hardly seems enough rationally to justify discounting Dr. Puente's reliance upon the preponderance of the evidence indicating

---

[35]

They also agreed that the appellant displayed adaptive deficits in the area of work, but because Dr. Compton believed the appellant demonstrated some concomitant strengths in this particular area, I do not list it here.

[36]

Dr. Puente also determined from the testing that the appellant was not malingering.

a substantial deficit in communication skills.

**Self-Care:** Dr. Puente cataloged the appellant's apparent deficits in this area as follows:

> A few things to note, and there's several. I don't know if you've ever seen pictures of them, and where he's purchased his own clothes. He wears clothes that are very large. He has a picture of himself, which actually is a pretty nice, handsome picture, but he wears basically bathroom slippers in this picture. So it's like he's wearing blue jeans and a nice shirt, but bathroom slippers to go out. This is inapp – inappropriate. He puts on dirty clothes after – after taking a shower. And in addition to that, he does brush his teeth, but he needs prompting.

Mara Cruz testified that the appellant could not be taught to read an analog clock or to program a cell phone. He did not take thorough showers and did not clean his ears or clip his nails. He had no concept of coordinating his clothes, and wore both clothing and shoes that were too big. He wore shirts with missing buttons and once put on one of Cruz's blouses to go out. On cross-examination, Cruz conceded that the appellant had not had clocks growing up in Mexico, but this does not explain the appellant's inability to be *taught* to read an analog clock. The State presented several detention officers to testify that in the institutional setting of the jail, the appellant could maintain his hygiene and keep his cell orderly. But evidence of apparent adaptive strengths displayed in an institutional context are of limited probative value. "A mentally retarded person is . . . likely to show stronger adaptive behavior in the structured environment of a correctional facility than in society[.]"[37]

---

[37] Richard J. Bonnie & Katherine Gustafson, *The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of*

"[C]ertain adaptive behaviors (e.g., grooming) may appear better due to the structure" of the institutional setting.[38] Moreover, it is common knowledge that inmates awaiting trial in jail are issued standard apparel. Perhaps this explains why the detention officers were not asked to refute the testimony that the appellant inappropriately dressed himself. Again, the jury was presented with little compelling reason to reject Dr. Puente's reliance on the data underlying his assessment of the appellant's ability to take care of his personal needs.

**Functional Academic Skills:** Dr. Puente summarized:

> Let me go into a little bit more detail in – in academics. He graduated from 6th grade at slightly less than 16 years-of-age. He flunked the third grade. Was out [of school] probably a total of two, maybe a little longer, three years possibly. His average score was 7.5. Seven point five, according to the grading system, is essentially barely passing. In essence, this is not an individual who did very well even at the grammar school level.

The appellant's sixth grade teacher testified that the appellant still could not read when he was in her class. To a certain extent, all of the children she taught were behind in their learning. But the appellant was a particularly slow learner even compared to the other disadvantaged children he went to school with in an area that was considered remote even by Mexican standards. She graduated him from sixth grade only because of his age. On cross-examination of the appellant's cousin, the State established that the appellant had

---

*Mental Retardation in Death Penalty Cases*, 41 U. Rich. L. Rev. 811, 848 (May 2007).

[38] Blume & Johnson, *supra*, at 720, *quoting* James R. Patton & Denis W. Keyes, Death Penalty Issues Following Atkins, 14(4) Exceptionality 237, 249 (2006). Cruz testified that it was after doing yard work that the appellant would fail to notice he needed to clean grass from his ears. Obviously the appellant would have no occasion to get grass in his ears while incarcerated pending prosecution for a capital murder.

sometimes missed school in order to work to help support his family. While this may partly explain why the appellant was so old when he finished the sixth grade, it does not rebut the teacher's testimony that the appellant was a slow learner even compared to the other underprivileged students he went to school with. Again, the State offered no convincing reason for the jury to disregard the information upon which Dr. Puente based his evaluation of the appellant's academic abilities.

Perhaps the jury might rationally have disbelieved the experts' opinions with respect to *some* of the many diagnostic areas in which, collectively, Drs. Puente and Compton were able to identify adaptive deficits on the appellant's part. But every mildly mentally retarded person will exhibit a different assortment of adaptive strengths and deficits, and the jury had no rational basis to reject *any* of the three areas in which the appellant's experts agreed he suffered substantial deficits, much less two out of three of them. That is enough to satisfy the diagnostic criteria for mental retardation—the standard upon which the jury *should* have been instructed in this cause. This conclusion is unaffected by the State's lay testimony from (1) the detention officer who testified that he had seen a lot of mental *illness* in his time, and the appellant did not exhibit any "mental issues"; (2) the other detention officer, whose personal experience led him to conclude that the appellant was not mentally retarded, but who could offer no definition of mental retardation; and (3) the used car salesman who saw nothing "mentally wrong" about the appellant that would dissuade him from selling the appellant a used truck.

The Court is correct, of course, that a reviewing court should pay great deference to a jury in assessing whether its verdict was against the great weight and preponderance of the evidence. But measuring the evidence against the hypothetically correct jury instruction that the jury should have received in this cause, I can only conclude that its finding that the appellant did not prove that he is mentally retarded is, indeed, against the great weight and preponderance of the evidence. On this state of the record, the appellant cannot be executed consonant with the Eighth Amendment. I would therefore vacate the jury's finding and remand the cause to the trial court to conduct another punishment proceeding.[39]

## III.

In *Briseno*, we decried the "exceedingly subjective" nature of the adaptive-behavior criteria.[40] And it may well be true that determining mental retardation under those criteria is as much an art as a science. But it is no solution to this lamentable subjectivity to substitute the normative caprice of the fact-finder for the comparative scientific objectivity

---

[39] An appellate finding that a jury's verdict on an issue for which the defendant shoulders the burden of proof is against the great weight and preponderance of the evidence carries no double-jeopardy consequences. *Meraz v. State*, *supra*, at 156. The appellant would not, therefore, be entitled by virtue of such a finding to have his punishment reformed to a sentence of confinement to life under Article 44.2511(b) of the Code of Criminal Procedure. TEX. CODE CRIM. PROC. art. 44.2511(b). Instead, I presume the jury's verdict would essentially constitute trial "error affecting punishment only," in contemplation of Articles 44.2511(d) and 44.29 (c) of the Code, necessitating a new punishment proceeding unless "the prosecuting attorney files a motion requesting that the sentence be reformed to confinement for life" under Article 44.2511(c)(2). TEX. CODE CRIM. PROC. arts. 44.2511(c) & (d) and 44.29(c).

[40] 135 S.W.3d at 8.

inherent in the diagnostic criteria. It is not enough that individual jurors might choose to be guided by the diagnostic criteria, as depicted to them by the testifying experts. The jury should be explicitly bound to those criteria by the hypothetically correct jury instruction as the best available scientific basis for distinguishing the mildly mentally retarded offenders from those who are merely borderline intelligent. Perhaps the diagnostic criteria are designedly over-inclusive in order to avoid leaving any deserving individuals out of the social services net.[41] But it seems to me that to err on the side of over-inclusiveness is no less a virtue in the Eighth Amendment context.

I am put in mind of the familiar due-process adage that "it is far worse to convict an innocent man than to let a guilty man go free."[42] The Court's scattershot approach to adaptive deficits—letting the fact-finder hunt and peck among adaptive deficits, unfettered by the specific diagnostic criteria that inform the expert opinion—will allow some capital offenders whom every rational diagnostician would find meets the clinical definition of mental retardation to be executed simply because they demonstrate a few pronounced adaptive strengths along with their manifest adaptive deficits. Better, I think, to be over-inclusive and mistakenly sentence some borderline intelligent capital offenders to the not-inconsiderable penalty of life imprisonment without the possibility of parole than to inadvertently execute even a single mildly mentally retarded offender in violation of the

---

[41] *Id.*

[42] *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).

strictures of the Eighth Amendment.[43]  The Court's arbitrary approach today is unfaithful to—it does not even "generally conform" with—the criteria for mental retardation that was the basis for the national consensus the Supreme Court found in *Atkins*.[44]

To affirming the appellant's death sentence in this case, I respectfully dissent.

Filed:        May 5, 2010
Do Not Publish

---

[43]

In an opinion issued just last week, we expressly declined to deviate from the specific diagnostic criteria for the *first* prong of the clinical standard for mental retardation. *Ex parte Hearn*, ___ S.W.3d ___ (Tex. Crim. App., No. AP-76,237, delivered April 28, 2010).  The applicant in that case was unable to satisfy the significant-subaverage-intellectual-functioning prong of the AAIDD and APA standards (and the definition in TEX. HEALTH & SAFETY CODE § 591.003(20)), in that he could not produce evidence of an IQ score that was at least two standard deviations below the mean for his age group.  He therefore resorted to an argument that we should instead accept, for Eighth Amendment purposes, an alternative measure for significant subaverage intellectual functioning based upon the results of certain "neuropsychological measures" related to a diagnosis of Fetal Alcohol Spectrum Disorder.  *Hearn*, *supra*, slip op. at 8 & 10.  I joined the Court's opinion because the applicant provided no proof of a national consensus for defining mental retardation in this way so as to establish an Eighth Amendment impediment to execution.  While I suppose this Court or the Legislature could someday choose a definition of mental retardation as a matter of state law that is *more* protective than the Eighth Amendment presently dictates, we cannot do so in a post-conviction writ context, wherein we are essentially limited to reviewing claims of federal constitutional import.  Having adhered to the present national consensus for purposes of *denying* habeas corpus relief in *Hearn*, the Court should likewise insist on adhering to it today and apply the specific diagnostic criteria for adaptive deficits to *grant* this appellant a new punishment hearing on direct appeal.

[44]

556 U.S. at 308 n.3 & 317 n.22.